# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

———————————

Nº 05-CV-5018 (JFB) (KAM)

———————————

DELPHINE PIERRE, AS MOTHER AND NATURAL GUARDIAN OF CHRISTOPHER SYLLA, AND COLLEEN GLASGOW, AS MOTHER AND NATURAL GUARDIAN OF ANDREW GLASGOW,

Plaintiffs,

VERSUS

THE CITY OF NEW YORK, POLICE OFFICER JOHN HACHADOORIAN, SERGEANT MICHAEL WHITE, AND POLICE OFFICERS JOHN AND JANE DOES #1-10,

Defendants.

———————————

MEMORANDUM AND ORDER
August 17, 2007

———————————

JOSEPH F. BIANCO, District Judge:

On October 27, 2005, plaintiffs Delphine Pierre, mother and natural guardian of Christopher Sylla, and Colleen Glasgow, mother and natural guardian of Andrew Glasgow (collectively, "plaintiffs"), commenced the instant civil rights action against defendants the City of New York, New York Police Department ("NYPD") Officer John Hachadoorian ("Officer Hachadoorian"), NYPD Sergeant Michael White ("Sgt. White"), and NYPD Officers John and Jane Does #1-10[1] (collectively, "defendants"), alleging claims under 42 U.S.C. § 1983 and the First, Fourth, Fifth, Eighth and Fourteenth Amendments for false arrest, malicious prosecution, and malicious abuse of process, as well as a claim of municipal liability.

On January 19, 2007, defendants moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, defendants' motion is granted.

———————————

[1] Although discovery is now complete, plaintiffs have failed to serve or to identify the John and Jane Does listed as defendants in the complaint.

The Court concludes that plaintiffs were provided with ample time to attempt to identify the John Doe defendants, and therefore dismisses plaintiffs' claims against John and Jane Does 1-10 without prejudice. *See Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 536 n.3 (S.D.N.Y. 2005).

## I. BACKGROUND

### A. Facts

The following facts are taken from the parties' depositions, declarations, exhibits and respective Local 56.1 statements of facts.[2] Upon consideration of a motion for summary judgment, the Court construes the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Thus, with regard to defendants' motion for summary judgment, the Court shall construe the facts in favor of plaintiffs.

On March 12, 2003, Showkat Hussein ("Hussein") purchased food at a deli in Astoria, Queens. (Defs.' 56.1 ¶¶ 10-11.) When Hussein exited the deli, he was carrying the food in a package. (*Id.* ¶ 11.) Immediately after Hussein exited the store, five or six teenagers surrounded him. (*Id.* ¶ 12.) One of the teenagers was carrying a four-foot-long metal stick. (*Id.*) The individual carrying the stick raised it above Hussein's head and tried to hit Hussein. (*Id.*) Another teenager said, "Motherf***** Indian, give me what you have." (*Id.*) Hussein threw his package of food at the teenagers and said "All I have is this." (*Id.* ¶ 15.) Hussein then ran towards his car, which was parked one or two blocks from the deli. (*Id.* ¶¶ 15-16.) Hussein got into his car, locked the doors, and called 911. (*Id.* ¶ 17.)

According to defendants, Hussein told the 911 operator that he had been robbed by a group of boys, one of whom tried to hit him with a metal rod. (*Id.* ¶ 18.) Hussein also allegedly told the 911 operator that he had thrown his food at the teenagers after they asked him to give them all he had. (*Id.* ¶ 19.) Defendants further alleged that Hussein told the 911 operator that he needed help and that he was concerned that the teenagers would cause other problems. (*Id.* ¶ 20.) Plaintiffs dispute that Hussein made any of these statements to the 911 operator. (Pl.'s Response to Defs.' 56.1, ¶¶ 18-20.)

From his car, Hussein could see the deli and the teenagers who had surrounded and threatened him. (Defs.' 56.1 ¶ 21.) He continued to watch the teenagers walk down the street together. (*Id.* ¶ 22.) While the teenagers were approximately one-and-a-half blocks away from Hussein, and while Hussein was still on the phone with the 911 operator, he decided to exit his car and follow the teenagers on foot. (*Id.* ¶ 23.) According to Hussein, he was trying to follow the teenagers so that he could identify them to the police. (*Id.* ¶ 24.) The 911 operator asked for the location of the teenagers, and Hussein continuously updated her as he followed them. (*Id.* ¶ 25.) Hussein remained on the phone with the 911 operator until a police vehicle arrived. (*Id.* ¶ 26.)

At the same time, Officer Hachadoorian and Sgt. White, plainclothes officers, were driving in an unmarked police vehicle. (*Id.* ¶ 27.) At approximately 4:30 p.m., the officers received radio notification of a robbery in progress at 35th Street and 30th Avenue in Queens, New York. (*Id.* ¶ 28.) The radio notification was the result of Hussein's 911 call. (*Id.* ¶ 29.) When the officers arrived at 35th Street and 30th Avenue, a marked police car had already arrived, and was being flagged down by Hussein. (*Id.* ¶ 30.) The marked police car turned on its lights and the teenagers began to run. (*Id.* ¶ 31.) Hussein

---

[2] Where one party's 56.1 statement is cited, the fact is not contested by the other party.

then told the police officers "[t]hose are them, the boys," and he pointed in the direction that the teenagers were running. (*Id.*) Officer Hachadoorian and Sgt. White exited their police vehicle and interviewed Hussein. (*Id.* ¶ 32.)

Hussein told the police officers what had happened, and said that he had seen all of the teenagers who were involved in the incident. (*Id.* ¶¶ 33-35.) Hussein also stated that he knew in which direction the teenagers had gone because he had followed them for a distance of three to four blocks. (*Id.* ¶ 36.) According to Hussein, when the teenagers ran, they split into approximately three groups. (*Id.* ¶ 37.) One group ran to the stairs of the 7 subway train, another group ran to a public bus stop, and a third group ran northbound on the street. (*Id.* ¶ 38.) Hussein then led Officer Hachadoorian and Sgt. White to a public bus located about one to two blocks away from where the officers initially spoke to Hussein. (*Id.* ¶ 39.) Hussein saw some of the teenagers who had surrounded him get onto a public bus. (*Id.* ¶ 40.) Hussein told Officer Hachadoorian and Sgt. White that he had seen the teenagers get onto the bus, and ran onto the bus. (*Id.* ¶ 41.) The officers then followed Hussein onto the bus. (*Id.* ¶ 42.)

Hussein initially did not see the teenagers, but as he moved towards the rear of the bus, he saw them trying to hide from him. (*Id.* ¶ 43.) According to Hussein, he was able to recognize the teenagers' faces, the color of their clothing, and their individual shirts, jackets, pants, shoes, hats and hair styles. (*Id.*) On the bus, Hussein pointed out to the officers three of the teenagers who had allegedly threatened and robbed him. (*Id.* ¶ 44.) These three individuals were Peter Yannah ("Yannah"), Andre Riley ("Riley"), and plaintiff Andrew Glasgow ("Glasgow").[3] (*Id.* ¶ 45.) Hussein told Officer Hachadoorian that he recognized the teenagers from their faces and clothing. (*Id.* ¶ 46.) Hussein also identified Riley as the teenager who had been holding the metal rod.[4] (*Id.* ¶ 47.) The officers asked Yannah, Riley and Glasgow to get off the bus with them.[5] (*Id.* ¶ 48.) Hussein also exited the bus. (*Id.* ¶ 49.) Outside of the bus, Officer Hachadoorian again asked Hussein whether he was sure that the teenagers whom he had identified on the bus were the same ones who had been involved in the earlier incident, and Hussein stated that they were the same individuals. (*Id.* ¶ 50.) Yannah, Riley and Glasgow were then placed under arrest. (*Id.* ¶ 51.) After the three individuals were handcuffed, Officer Hachadoorian again asked Hussein whether he was sure that these were the same teenagers who had threatened him. (*Id.* ¶ 52.) Hussein responded "[y]es, they were. Yes, they were, but there are still more." (*Id.*)

After Yannah, Riley and Glasgow were handcuffed, Officer Hachadoorian and Sgt. White returned to their unmarked police car and began to canvass the area for other individuals who matched the description of those who had attacked Hussein. (*Id.* ¶ 54.) The officers drove in the direction in which Hussein had indicated that the individuals fled. (*Id.* ¶ 55.) According to plaintiffs, while

---

[3] Plaintiffs deny that Glasgow threatened or robbed Hussein. (Pls.' Response to Defs.' 56.1 ¶ 44.)

[4] Defense counsel stated at oral argument that both Yannah and Riley later pled guilty to the charges levied against them in relation to this incident.

[5] Plaintiffs contend that the officers ordered the teenagers off of the bus. (Pls.' Response to Defs.' 56.1 ¶ 48.)

the officers were driving around the area, Christopher Sylla ("Sylla") entered his first-floor apartment, on Newtowne Avenue, with a friend, Shannon McBean ("McBean"), with whom he had left school that afternoon. (Sylla Deposition, at 61.) Sylla and McBean then heard banging on the door. (*Id.* at 62.) McBean went to investigate, and returned to tell Sylla that police officers had asked him to come outside. (*Id.* at 63-64.) Sylla walked outside of the building, where he was confronted by Officer Hachadoorian and Sgt. White.[6] (*Id.* at 64.) A marked police van and a marked police vehicle arrived at Sylla's building, and another officer or officers brought Hussein over to where Sylla, McBean, Officer Hachadoorian and Sgt. White were standing. (*Id.* ¶¶ 57-58.) Officer Hachadoorian asked Hussein to look at Sylla and McBean, and to tell him if either one had been involved in the earlier incident. (*Id.* ¶ 59.) Hussein identified only one of the teenagers, Sylla, as having been involved in the incident. (*Id.* ¶ 60.) According to Hussein, he remembered seeing Sylla's face. (*Id.*) Officer Hachadoorian then asked Hussein to double-check to make sure that they had the right individual, and to make sure that McBean had not been involved. (*Id.* ¶ 61.) Hussein assured Officer Hachadoorian that McBean had not been involved, and that

[6] According to defendants, the officers stopped plaintiff Sylla as he was walking with another individual towards a building. (Defs.' 56.1 ¶ 56.) Defendants aver that the officers suspected that Sylla was one of the teenagers who had threatened Hussein based upon the general description that Hussein had given them of the age, general height and weight, and clothing of the perpetrators. (*Id.*) Defendants also state that there was a clothing description that was provided to the officers over the radio, and that Sylla matched all of the descriptions. (*Id.*)

Sylla had been involved. (*Id.*) Sylla was placed under arrest and transported to the 114th Precinct. (*Id.* ¶ 62.)

Sylla told his mother, Delphine Pierre ("Pierre") that he had been around 30th Avenue and 31st Street, when he saw some teenagers being "loud." (*Id.* ¶ 66.) Sylla also told Pierre that he saw an individual waving a stick at a man, and that Sylla saw the man open his cell phone, but that he did not know who the man had called. (*Id.*) Sylla told his mother that he had explained to the police that he had witnessed the incident with Hussein, but was not part of the group of people who threatened him. (*Id.* ¶ 72.)

Glasgow testified that, on the date of the incident, he had walked to a bus stop from school with Yannah and Riley. (*Id.* ¶ 67.) Glasgow stated that, after he got onto the bus with Yannah and Riley, police came onto the bus with an Indian man who pointed out Riley and Yannah, who were both standing, and said "[t]hat is them." (*Id.* ¶ 69.) Glasgow also stated that, after Riley and Yannah got off the bus, the Indian man looked around the bus, pointed at Glasgow, who was seated, and said "[t]hat is him too." (*Id.* ¶ 70.) Colleen Glasgow, Glasgow's mother, testified that her son told her that he and his friends had been horsing around and running towards the bus when they saw it approaching. (*Id.* ¶ 73.) Colleen Glasgow had told Officer Hachadoorian that her son was friends with both Sylla and Yannah. (*Id.* ¶ 74.)

Hussein met with a prosecutor who took a statement from him, which he signed. (*Id.* ¶ 77.) On March 24, 2003, a Family Court Complaint was signed and sworn by Hussein against Sylla, Glasgow and Yannah. (*Id.* ¶ 68; Hazan Decl., Ex. 16.) On April 1, 2003, an initial conference was held with regard to

Sylla and Glasgow. (Defs.' 56.1 ¶ 79.) Sylla and Glasgow were each charged with "an act that would be Robbery in the Second Degree if either were an adult." (*Id.*) On May 4, 2005, Judge Fran L. Lubow dismissed both cases. (*Id.* ¶ 80.)

## B. Procedural History

Plaintiffs filed this action on October 27, 2005, naming the City of New York, Officer Hachadoorian, and Police Officer John and Jane Does #1-10. On January 28, 2006, plaintiffs filed an amended complaint, adding Sgt. White as a defendant and alleging claims under 42 U.S.C. §§ 1983 and 1988, and under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments for false arrest, malicious prosecution, malicious abuse of process and municipal liability. On January 19, 2007, defendants filed a motion for summary judgment under Federal Rule of Civil Procedure 56. Oral argument was held on July 9, 2007.

## II. STANDARD OF REVIEW

The standards for summary judgment are well-settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.*, 434 F.3d 165, 170 (2d Cir. 2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). The court "is not to weigh the evidence but is instead required

to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48. Thus, the nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (internal quotations omitted). Accordingly, it is insufficient for a party opposing summary judgment "merely to assert a conclusion without supplying supporting arguments or facts." *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (internal quotations omitted).

## III. DISCUSSION

### A. Plaintiffs' Claims Under 42 U.S.C. § 1983

To prevail on a claim under section 1983, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, (2) by a person acting under the color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress of the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)). "Claims for false arrest or malicious prosecution, brought under § 1983 to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." *Jocks v. Tavernier*, 316 F.3d 128, 134 (2d Cir. 2003) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (false arrest) and citing *Conway v. Village of Mount Kisco*, 750 F.2d 205, 214 (2d Cir. 1984) (malicious prosecution)).

### 1. False Arrest

The Second Circuit has established that "[t]he existence of probable cause to arrest constitutes justification and 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under Section 1983." *Weyant*, 101 F.3d at 852 (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) and citing *Broughton v. State*, 335 N.E.2d 310, 315 (N.Y. 1975) (holding that, under New York law, "[j]ustification may be established by showing that the arrest was based on probable cause")

and *Singer v. Fulton Cty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) ("There can be no federal civil rights claim for false arrest where the arresting officer had probable cause."). In general, probable cause is established where "the arresting officer has 'knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.'"[7] *Singer*, 63 F.3d at 119 (quoting *O'Neill v. Town of Babylon*, 986 F.2d 646, 650 (2d Cir. 1993) (citation omitted)); *see also Weyant*, 101 F.3d at 852 (citing *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979)) (additional citations omitted). Furthermore, "the validity of an arrest does not depend upon an ultimate finding of guilt or innocence." *Peterson v. County of Nassau*, 995 F. Supp. 305, 313 (E.D.N.Y. 1998) (citing *Pierson v. Ray*, 386 U.S. 547, 555 (1967), *overruled on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982)). "Rather, the court looks only to the information the arresting officer had at the time of the arrest." *Id.* (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Moreover, a determination of probable cause is based upon the "totality of the circumstances, [and] 'where law enforcement authorities are cooperating in an investigation

---

[7] In New York State, "a police officer may arrest a person for . . . a crime when he has reasonable cause to believe that such person has committed such crime, whether in his presence or otherwise." N.Y. Crim. Proc. Law § 140.10(1)(b). "'Reasonable cause to believe that a person has committed an offense' exists when evidence or information which appears reliable discloses facts or circumstances which are collectively of such weight and persuasiveness as to convince a person of ordinary intelligence, judgment and experience that it is reasonably likely that such offense was committed and that such person committed it." N.Y. Crim. Proc. Law § 70.10.

. . ., the knowledge of one is presumed shared by all.'" *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir. 1989) (quoting *Illinois v. Andreas*, 463 U.S. 765, 771 n.5 (1983)) (additional citations omitted); *see also Bernard*, 25 F.3d at 102 (citing *Illinois v. Gates*, 462 U.S. 213, 230 (1982)). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers, or may require a trial if the facts are in dispute." *Weyant*, 101 F.3d at 852 (citations omitted). Where an issue of probable cause is "factual in nature," it must be presented to a jury. *Moore v. Comesanas*, 32 F.3d 670, 673 (2d Cir. 1994) (citations omitted). Furthermore, an officer who merely observes or assists in an arrest, even if he is not the "arresting officer" may be liable for failing to intercede to prevent an arrest without probable cause. *See O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d Cir. 1988) ("A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers.") (citations omitted).

Defendants contend that Officer Hachadoorian and Sgt. White had probable cause to arrest plaintiffs Sylla and Glasgow for (1) menacing in the third degree, N.Y. Penal Law § 120.15; (2) robbery in the second and third degrees, N.Y. Penal Law §§ 160.10, 160.05; (3) grand larceny in the fourth degree, N.Y. Penal Law § 155.30; (4) criminal facilitation in the fourth degree, N.Y. Penal Law § 115.00; and (5) attempting to commit a crime, N.Y. Penal Law § 110.00, on the basis of Hussein's description of the incident and his identification of Sylla and Glasgow as two of the individuals who participated in the attack. As set forth below, the Court finds that the officers had probable cause to arrest both plaintiffs for robbery in the second degree. Moreover, even assuming *arguendo* that a rational jury could conclude that there was no probable cause to arrest Glasgow and Sylla, it is clear that police officers of reasonable competence could disagree as to whether there was probable cause to believe that Glasgow and Sylla had violated the law. Therefore, plaintiffs' claims of false arrest are dismissed, in any event, based upon the defense of qualified immunity.

(a) The Arrests

(i) Andrew Glasgow

After responding to a "radio run" for a robbery in progress, Officer Hachadoorian and Sgt. White located Hussein, who was flagging down the police car. (Hachadoorian Deposition, at 19-28.) Hussein told Hachadoorian that, after coming out of a store from buying food, he was surrounded by a group of teenagers. (*Id.* at 28.) One of the teenagers was armed with a metal rod and told Hussein "give us what you have – what do you have, give us what you have." (*Id.* at 28.) Hussein also told the officers that one of the teenagers had been carrying a metal rod, and that this teenager swung the rod at him, stopping short of hitting Hussein in the head. (*Id.* at 29.) Hussein said that the teenagers were scaring him and preventing him from leaving, and that, eventually, he handed over his food and ran from the location. (*Id.* at 28-29, 32-33.) According to Hachadoorian, Hussein then directed the officers to a bus. (*Id.* at 38.) Hachadoorian testified at his deposition that Hussein "stated that he saw the children go on the bus, the kids who robbed him go on the bus and he left us and walked – and proceeded onto the bus." (*Id.* at 43.) Officer Hachadoorian and Sgt. White followed Hussein onto the bus, where Hussein

"proceeded to a point on the bus and stopped and pointed out three individuals on the bus." (*Id.* at 49.) Officer Hachadoorian testified that, at that point, "[Hussein] pointed the boys out and stated these are the boys, these are the ones that robbed me."[8] (*Id.*) Hussein explained to Officer Hachadoorian that he remembered the faces and clothing of the teenagers from the incident. (*Id.* at 49-50.) According to Officer Hachadoorian, the officers, Hussein, and the three teenagers, one of whom was Glasgow, stepped off of the bus. (*Id.* at 51-52.) Officer Hachadoorian then asked Hussein "if he was sure if these were the three kids that were involved." (*Id.* at 52.) Hussein responded "yes, he was." (*Id.*) Officer Hachadoorian then placed the three individuals under arrest and put handcuffs on them. (*Id.*) After the handcuffs were on, Officer Hachadoorian again asked Hussein "if he was sure if these were the boys." (*Id.* at 56.) Hussein responded that they were. (*Id.*)

(ii) Christopher Sylla

According to Officer Hachadoorian, after Glasgow had been arrested, Hussein stated that there were "more" perpetrators to be found and went running. (*Id.* at 56-58.)

Officer Hachadoorian presumed that Hussein had gone to find the remaining perpetrators. (*Id.* at 57-58.) Officer Hachadoorian and Sgt. White got into their police car to search the neighborhood for the complainant or any "additional parties involved." (*Id.* at 58.) Officer Hachadoorian testified that he and Sgt. White came across two young black males crossing a street. (*Id.* at 61.) He stopped the car, then both of the officers got out of the car, identified themselves and asked the teenagers to talk with them for a moment.[9] (*Id.* at 61-62.) At this point, according to Officer Hachadoorian, the two officers and the two teenagers were standing outside of an apartment building. (*Id.* at 61-62.) Officer Hachadoorian then told the teenagers about the incident involving Hussein, and stated that they matched the general description of the perpetrators. (*Id.* at 62.) Another officer radioed to Officer Hachadoorian that he had located Hussein and would be driving to the apartment building so that Hussein could see the two teenagers. (*Id.* at 63-67.) Officer Hachadoorian then told the teenagers that Hussein would be coming by, and stated "[i]f he doesn't recognize you as being involved, if you weren't involved in the crime, you'll go on your way." (*Id.* at 68.) When Hussein arrived at the scene in a police van, Officer Hachadoorian asked him to look through the window of the van and determine whether either of the teenagers standing in front of the

---

[8] While plaintiffs contend that Glasgow "never heard Mr. Hussein tell a police officer that he had been robbed," (Pls.' Resp. to Defs.' 56.1 Stmt. ¶ 53 (citing Glasgow Deposition, at 139-40)), it is undisputed that Hussein told the 911 operator that he had been robbed (Hussein Deposition, at 24) and told Officer Hachadoorian and Sgt. White that one of the youths had demanded "give us what you have," and that Hussein had handed over his food to them. (Hachadoorian Deposition, at 28.) Therefore, the Court finds that, although Glasgow did not hear Hussein state, in Glasgow's presence, that he had been robbed, Hussein had stated as much to the police prior to the apprehension of Glasgow at the bus stop.

[9] According to plaintiffs, Sylla was not walking down the street when he was stopped by the officers. (Sylla Deposition, at 59-63.) Sylla testified that he was inside of his apartment when he heard banging on the door. (*Id.* at 63-64.) His friend went to investigate the banging, then returned and told Sylla that police officers wanted to talk with him outside. (*Id.* at 63-64.) However, the Court finds that this discrepancy in the alleged facts is not material to the probable cause analysis.

apartment building had been involved in the incident. (*Id.* at 68-72.) Hussein looked through the window and told the officer that one of the teenagers was involved, and that he remembered the individual's face. (*Id.* at 72-73.) Officer Hachadoorian then asked Hussein to "double check" and he "made sure we identified the correct boy." (*Id.* at 74.) According to Officer Hachadoorian, Hussein "was sure on one and he was sure that the other one was not involved." (*Id.*) The individual identified as having been involved in the incident was Sylla. (*Id.* at 83.)

### (c) Probable Cause to Arrest Glasgow and Sylla

Based upon the undisputed record, as recounted above, the Court concludes that Hussein's description of the incident to the officers, combined with his identification of Glasgow and Sylla as two of the perpetrators, provided probable cause for Officer Hachadoorian and Sgt. White to arrest Glasgow and Sylla for robbery in the second degree.[10]

Under New York Penal Law § 160.10, "[a] person is guilty of robbery in the second degree when he forcibly steals property and when . . . [h]e is aided by another person actually present." *See, e.g., In re Louis C.*, 774 N.Y.S.2d 567 (N.Y. App. Div. 2004) (holding that juvenile had committed acts constituting robbery in the second degree where defendant participated in an incident where a group of three other youths surrounded the victim as he exited a restaurant, demanded money, punched the victim in the jaw and struck him with a skateboard, and where the victim later discovered that he was missing money from his pocket); *Matter of Joseph J.*, 614 N.Y.S.2d 39 (N.Y. App. Div. 1994) (finding that juvenile had committed acts constituting robbery in the second degree where he arrived at the crime scene with seven other youths, one of whom punched the victim and took his property and two of whom punched and kicked the victim while the other youths, including the defendant, surrounded the victim). The acts alleged here – being present in the group of boys surrounding Hussein, asking Hussein to give up what he had, prompting Hussein to throw his food at the boys, and standing alongside an individual wielding a metal rod over Hussein's head – clearly constitute robbery in the second degree within the meaning of the statute.

Moreover, with respect to the basis for probable cause, Hussein, the victim, contacted the police regarding the crime against him, followed the attackers, and identified Glasgow and Sylla as two of the teenagers who had participated in the robbery, thereby providing probable cause for the police officers to arrest them. It is well-established that "[w]hen information

---

[10] The fact that plaintiffs were actually arrested only for robbery in the second degree, rather than any of the other charges suggested by defendants, does not affect the probable cause inquiry: "a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and . . . it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of the arrest." *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004) (holding that the probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause, and rejecting the view that probable cause must be predicated upon the offense invoked by – or an offense similar to the

offense invoked by – the arresting officer)).

[regarding an alleged crime] is received from a putative victim or an eyewitness, probable cause exists . . . unless the circumstances raise doubt as to the person's veracity." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citing *Singer*, 63 F.3d at 119); *see also Martinez v. Simonetti*, 202 F.2d 625, 634 (2d Cir. 2000) ("We have previously held that police officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed."); *McKinney v. George*, 726 F.2d 1183, 1187 (7th Cir. 1984) ("If policemen arrest a person on the basis of a private citizen's complaint that if true would justify the arrest, and they reasonably believe it is true, they cannot be held liable for a violation of the Constitution merely because it later turns out that the complaint was unfounded."). Moreover, "[t]he veracity of citizen complain[an]ts who are the victims of the very crime they report to the police is assumed." *Miloslavsky v. AES Eng'g Soc'y, Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992) (citing *Adams v. Williams*, 407 U.S. 143, 148 (1972)), *aff'd*, 993 F.2d 1534 (2d Cir. 1993); *accord Lee v. Sandberg*, 136 F.3d 94, 103 n.5 (2d Cir. 1997) (quoting *Miloslavsky* with approval); *see also* 2 Wayne LaFave, *Search and Seizure: A Treatise On The Fourth Amendment* § 3.4(a), at 205 (4th ed. 2007) (noting that the Supreme Court has "proceeded as if veracity may be assumed when information comes from the victim of . . . criminal activity") (citing *Chambers v. Maroney*, 399 U.S. 42 (1970)).

Plaintiffs contend that (1) the circumstances of the incident should have raised questions regarding Hussein's veracity; and (2) that the police officers should have verified Hussein's account with independent corroborating evidence before arresting Glasgow and Sylla. (Pls.' Br., at 5-7.) The

Court is not persuaded by either argument.

First, plaintiffs argue that because the incident took place as it was getting dark, lasted for only a few seconds, and involved a threat of imminent violence to the victim, "[a] jury could certainly find that, under those circumstances, it was preposterous for defendants to believe that Mr. Hussein had the time, ability and presence of mind to memorize the faces of the teenagers." (Pls.' Br., at 6.) At oral argument, counsel for plaintiffs emphasized that Hussein was distraught and upset when he reported the events to the police, and therefore was unable to properly identify his attackers. However, these circumstances are not sufficient for the police officers to have doubted or discredited Hussein's account of the crime or his assertions that Glasgow and Sylla were involved. In fact, courts have been reluctant to doubt the veracity of a complaining victim based upon the short duration of an encounter or a victim's emotional distress as a result of a crime. *See, e.g., Chavis v. Henderson*, 638 F.2d 534, 536 (2d Cir. 1980) (finding forty-five seconds to be sufficient time to support a reliable identification); *Torrez v. Sabourin*, No. 00-CV-3286 (AGS), 2001 U.S. Dist. LEXIS 5265 (S.D.N.Y. Apr. 19, 2001) (finding probable cause to arrest where the incident only lasted "a few seconds," holding that "'the endurance of the . . . encounter . . . does not require a different result") (quoting *Warren v. Miller*, 78 F. Supp. 2d 120, 136 (E.D.N.Y. 2000)); *Grant v. City of New York*, 848 F. Supp. 1131, 1135 (S.D.N.Y. 1994) (declining to find that the officers had cause to doubt victim's claim that the plaintiff had raped her where the plaintiff "was upset, [but] she was not incoherent or drunk"); *Fazzino v. Chiu*, 771 F. Supp. 518 (D. Conn. 1991) (finding probable cause where reporting victim was "crying, shaking, and afraid"). In

this case, the victim stated to police that he had observed the teenagers who had surrounded him, followed the teenagers as they left the scene, and then identified them to the police as his attackers. Under these circumstances, the time of day, length of attack, and the victim's emotional distress did not provide a basis to raise doubt as to the victim's veracity and, therefore, did not undermine the clear existence of probable cause to arrest Glasgow and Sylla.

Second, the police officers were under no obligation to investigate Hussein's claims or his identifications of his attackers any further at the time of Glasgow and Sylla's arrests. *Ricciuti*, 124 F.3d at 128 ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore or eliminate every theoretically plausible claim of innocence before making an arrest."); *Curley*, 268 F.3d at 70 ("Although a better procedure may have been for the officers to investigate plaintiff's version of events more completely, the arresting officer does not have to prove plaintiff's version wrong before arresting him."); *Cornett v. Brown*, No. 04-CV-0754 (DGT) (LB), 2006 U.S. Dist. LEXIS 22415, at *23 (E.D.N.Y. Mar. 30, 2006) ("[W]hile an arresting officer may not disregard information known to him in making an arrest, he is not required 'to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest.") (quoting *Jocks*, 316 F.3d at 135-36); *Grant*, 848 F. Supp. at 1135 (holding that the police had no further obligation at the time of plaintiff's arrest to investigate victim's claim once they had a reasonable belief that probable cause to arrest existed). As one court explained:

[F]urther investigation might have proven the victim's story to be subject to question or that plaintiff's alibi was reliably corroborated. Probable cause is, however, determined at the time of the arrest. The question is not what might have been developed from further investigation, but whether the facts known when, and on which, defendant acted were sufficient to constitute probable cause. In other words, the relevant inquiry is not whether the statement on which defendant acted was true but whether defendant was truly told information which constituted a lawful basis on which to have found probable cause.

*Fazzino*, 771 F. Supp. at 521. Therefore, the Court rejects plaintiffs' argument that the police officers needed to conduct further investigation of Hussein's allegations, and concludes, for the reasons set forth *supra*, that the defendants had probable cause to arrest plaintiffs.

### (d) Qualified Immunity

In any event, even assuming *arguendo* that Officer Hachadoorian and Sgt. White did not have probable cause to arrest Glasgow and Sylla, the Court concludes that the defendants are entitled to qualified immunity as to the plaintiffs' false arrest claims. An arresting officer is entitled to qualified immunity on a claim of false arrest if either: "(a) it was objectively reasonable for the officer to believe that probable cause existed; or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *O'Neill*, 986 F.2d at 649-50 (quotation marks and citation omitted); *see also Lennon v. Miller*, 66 F.3d 416, 424-25 (2d Cir. 1995). "The right not to be arrested

or prosecuted without probable cause has, of course, long been a clearly established constitutional right." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991).

It is well-settled that "the issue of the reasonableness of an arrest or a search for purposes of a Fourth Amendment inquiry is distinct from the issue of objective reasonableness for purposes of a qualified immunity inquiry." *Provost*, 262 F.3d at 168 n.5 (citing *Anderson*, 483 U.S. at 641 ("It simply does not follow immediately from the conclusion that it was firmly established that warrantless searches not supported by probable cause and exigent circumstances violate the Fourth Amendment that [the] search was objectively legally unreasonable.")) (additional citation omitted). In *Anderson v. Creighton*, the Supreme Court held that "it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials – like other officials who act in ways they reasonably believe to be lawful – should not be held personally liable." 483 U.S. at 641.

This standard, often referred to as "arguable probable cause," has been defined by the Second Circuit as follows:

> Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in the light of well established law.

*Cerrone v. Brown*, 246 F.3d 194, 203 (2d Cir. 2001) (quotation marks and citations omitted). Furthermore, "an 'arresting officer is entitled to qualified immunity as a matter of law if the undisputed facts and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met.'" *McClellan v. Smith*, 439 F.3d 137, 147-48 (2d Cir. 2006) (quoting *Robison v. Via*, 821 F.2d 913, 921 (2d Cir. 1987)).

For the same reasons that the Court concludes that probable cause existed to arrest plaintiffs, the Court also finds that the police officers, at the very least, had arguable probable cause to arrest plaintiffs. Plaintiffs do not contest that Hussein informed the police that he had been surrounded, threatened and asked to surrender his property, and that Hussein identified Glasgow and Sylla as two of his attackers. Accordingly, in light of "well established law" providing that probable cause to arrest may be based upon information provided by crime victim (absent any objective factors undermining the victim's veracity), *see supra*, a reasonable officer in the same position as Officer Hachadoorian and Sgt. White "could have reasonably believed that probable cause existed" to arrest Glasgow and Sylla. *Cerrone*, 246 F.3d at 203. Accordingly, at a minimum, defendants are entitled to the defense of qualified immunity as to the false arrest claims, and summary judgment is therefore granted in defendants' favor as to such claims.

2. Malicious Prosecution

The Court also finds that plaintiffs' malicious prosecution claims are without merit. "'Because there are no federal rules of decision for adjudicating § 1983 actions that are based upon claims of malicious prosecution, [courts] are required by 42 U.S.C. § 1988 to turn to state law . . . for such rules.'" *Alicea v. City of New York*, No. 04-

CV-1243 (RMB), 2005 U.S. Dist. LEXIS 28129, at *17 (S.D.N.Y. Nov. 15, 2005) (quoting *Conway v. Mt. Kisco*, 750 F.2d 205, 214 (2d Cir. 1984)). "A malicious prosecution claim under New York law requires the plaintiff to prove '(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions.'" *Jocks*, 316 F.3d at 136 (quoting *Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) (internal quotation marks omitted)). In addition to the required state law elements, "to sustain a § 1983 malicious prosecution claim, there must be a seizure or other 'perversion of proper legal procedures' implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (quoting *Singer*, 63 F.3d at 117).

As explained *supra*, there was probable cause to arrest Glasgow and Sylla for robbery in the second degree. Because no additional facts were uncovered following Glasgow and Sylla's arrest to vitiate the existing probable cause to arrest, the officers also had probable cause to prosecute the plaintiffs for robbery in the second degree.[11] Moreover, even if a jury

could conclude that there was no probable cause to prosecute Glasgow and Sylla, it is clear that police officers of reasonable competence could disagree as to whether Glasgow and Sylla had committed robbery in the first degree against Hussein, thus establishing arguable probable cause to prosecute him under New York Penal Law § 160.10, and thereby entitling defendants to qualified immunity.

Moreover, as set forth below, plaintiffs have failed to demonstrate (1) that defendants initiated criminal proceedings against them; or (2) that criminal proceedings against them were terminated in their favor. Accordingly, even if, assuming *arguendo* plaintiffs were able to establish that probable cause did not exist, their malicious prosecution claims would nevertheless fail.

In this case, the defendants merely effectuated the arrests of plaintiffs. "The independent, discretionary actions of the [prosecutor] served to break any causal connection between [defendants] and the prosecution commenced against [p]laintiff[s]." *Stephenson v. Rosa*, 03-CV-8503, 2006 U.S. Dist. LEXIS 7390, at *8 (E.D.N.Y. Feb. 24, 2006). Plaintiffs have not demonstrated that defendants either deceived or unduly pressured the prosecutor, nor that the police officers were the complaining witnesses. In fact, the attorney assigned to the case by the New York City Law Department, Lori B. Iskowitz, declared that she "made the decision on behalf of [the Law Department] to prosecute Mr. Sylla and Mr. Glasgow with what would be Robbery in the Second Degree

---

[11] It is well-settled that

> If there was probable cause to arrest the plaintiff, . . . then the same probable cause "is a bar to claims of malicious prosecution directed at the arresting officer under § 1983 . . . unless that officer, following the arrest but prior to initiating prosecution, learned of facts that would negate his earlier determination of probable cause."

*Joyner v. Morales*, No. 04-CV-569 (AKH), 2005 WL 883327, at *4 (S.D.N.Y. April 15, 2005) (quoting *Moscoso v. City of New York*, 92 F. Supp. 2d 310, 313 (2000)).

had they been adults. . . . The legal charges in the petitions which were filed were determined by the [Law Department] and not by the New York City Police Department or any police officers." (Hazan Decl., Ex. 19.) Therefore, it cannot be said that defendants initiated the action. *See, e.g., Webster v. City of New York*, 333 F.Supp. 2d 184, 198 (S.D.N.Y. 2004) (denying summary judgment where the defendant police officers were complaining witnesses).

In addition, plaintiffs have failed to establish that the criminal proceedings commenced against them were terminated in their favor. *See Murphy*, 118 F.3d at 947. It is well-settled that "[w]here the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused, . . . only when its final disposition is such as to indicate the innocence of the accused." *Id.* at 948 (citing *MacFawn v. Kresler*, 666 N.E.2d 1359 (N.Y. 1996); *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995) ("In the absence of a decision on the merits, the plaintiff must show that the final disposition is indicative of innocence.")). In this instance, the cases against plaintiffs were dismissed because Hussein, the complaining witness, failed to appear at Family Court to testify. (Hazan Decl., Ex. 19.) A termination for this reason fails to demonstrate the innocence of plaintiffs, and thus, does not constitute a termination in plaintiffs' favor.

Therefore, plaintiffs' malicious prosecution claims against the defendants must be dismissed.

### 3. Abuse of Process

In order to establish liability for malicious abuse of process under § 1983, a plaintiff must establish the claim's elements under state law. *See Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994). A malicious abuse of process claim may be asserted where a defendant "(1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir. 2003) (quoting *Cook*, 41 F.3d at 80). Plaintiffs' abuse of process claims fail because there is no evidence in the record that defendants aimed to achieve an objective other than Glasgow and Sylla's prosecution and conviction.[12] *Savino*, 331 F.3d at 77 ("[T]o state a claim for abuse of criminal process, it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution."); *Pierre-Antoine v. City of New York*, No. 04-CV-6987 (GEL), 2006 WL 1292076, at *8 (S.D.N.Y. May 9, 2006) (dismissing plaintiffs' abuse of process claim based on

---

[12] Plaintiffs argue that they would present evidence at trial that the prosecution of Glasgow and Sylla was intended to satisfy police department quotas, and that this intention satisfies the "collateral purpose" requirement of an abuse of process claim. (Pls.' Br., at 12.) According to plaintiffs, they are unable to provide such evidence at the summary judgment stage because discovery in this case was bifurcated. (Pls.' Br., at 12 n.5.) However, even if plaintiffs were able to raise a material question of fact as to the "collateral purpose" element of the abuse of process claims, for the reasons set forth *infra*, the Court finds that plaintiffs cannot establish the second element of their abuse of process claims – intent to do harm "without excuse or justification." *Savino*, 331 F.3d at 76.

failure to allege or provide evidence of collateral purpose outside legitimate ends of the process); *see also Brewster v. Nassau County*, 349 F.Supp.2d 540, 550 (E.D.N.Y. 2004) (same); *Curiano v. Suozzi*, 469 N.E.2d 1324 (N.Y. 1984) ("A malicious motive alone . . . does not give rise to a cause of action for abuse of process."). Moreover, even if plaintiffs were able to demonstrate that material questions of fact exist as to a "collateral objective" on the part of defendants, the Court finds that, because Officer Hachadoorian and Sgt. White had probable cause to prosecute plaintiffs, they cannot demonstrate that defendants intended to do harm "without excuse or justification." Savino, 331 F.3d at 76. While probable cause is not an element of an abuse of process claim, under New York law, "a showing of probable cause at the time process issued suffices . . . to establish 'excuse or justification' for the purposes of a defense to abuse of process." *Granato v. City of New York*, No. 98-CV-667 (ILG), 1999 U.S. Dist. LEXIS 18550, at *28 (E.D.N.Y. Oct. 18, 1999) (citing *Berman v. Silver, Forrester & Schisano*, 549 N.Y.S.2d 125, 127 (N.Y. App. Div. 1989) (sustaining entry of summary judgment on a claim for abuse of process where the record demonstrated that the defendants had "probable cause" to commence an action for specific performance)); *accord Pierre-Antoine*, 2006 WL 1292076, at *8. Therefore, because defendants had probable cause – and thus, "excuse or justification" – to prosecute plaintiffs, the Court grants defendants' motion for summary judgment as to plaintiffs' abuse of process claims.

### 4. Due Process

The Court also finds plaintiffs' due process claims under the Fourteenth Amendment to be without merit. "Due process requires probable cause for an arrest, and when police officers acting in bad faith make an arrest without probable cause, the person arrested has suffered a deprivation of liberty without due process of law." *United States v. McDermott*, 918 F.2d 319, 325 (2d Cir. 1990). Accordingly, as the Court finds that Officer Hachadoorian and Sgt. White had probable cause to arrest plaintiffs, summary judgment as to plaintiffs' due process claims is granted. *See Clark v. Dowty*, No. 05-CV-1345 (WWE), 2007 U.S. Dist. LEXIS 49184, at *18 (D. Conn. Jul. 9, 2007) ("Because the Court has already found that probable cause existed for the arrest of plaintiff, there was no violation of his substantive or procedural due process rights regarding this claim.") (citing *Lucky v. City of New York*, No. 03-CV-1983 (DLC), 2004 U.S. Dist. LEXIS 18672, at *18 (S.D.N.Y. Sept. 21, 2004) (where there was probable cause for plaintiff's arrest, there was no violation of substantive due process), *aff'd*, 140 Fed. Appx. 301 (2d Cir. 2005); *N.Y.S. Nat'l Org. For Women v. Pataki*, 261 F.3d 156, 172-73 (2d Cir. 2001) ("Because no constitutional violation has been shown, the plaintiffs' procedural due process claims are dismissed with prejudice.")); *Little v. City of New York*, 487 F. Supp. 2d 426, 442-43 (S.D.N.Y. 2007) ("[N]o reasonable juror could conclude that [defendant] deprived plaintiff of his liberty without due process because . . . [defendant] had probable cause for the arrest.").

### 5. Cruel and Unusual Punishment

With respect to plaintiffs' Eighth Amendment claims, the Court notes as a threshold matter that, because plaintiffs' opposition papers did not address defendants' motion for summary judgment on this claim, the claim is deemed abandoned and summary judgment could be granted on that basis alone.

*See Bellegar de Dussuau v. Blockbuster, Inc.*, No. 03-CV-6614 (WHP), 2006 WL 465374, at *7 (S.D.N.Y. Feb. 28, 2006) (finding claim abandoned by virtue of plaintiff's failure to address it in opposition to defendant's summary judgment motion on the claim); *see also DeVito v. Barrant*, No. 03-CV-1927 (DLI), 2005 WL 2033722, at *10 (E.D.N.Y. Aug. 23, 2005) (same); *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."); *Arias v. NASDAQ/AMEX Mkt. Group*, No. 00-CV-9827 (MBM), 2003 WL 354978, at *13 (S.D.N.Y. Feb. 18, 2003) (dismissing claims as "abandoned" where plaintiff's summary judgment opposition "neither refute[d] nor even mention[ed]" defendant's argument for summary judgment on two of his claims); *see also* Local Civ. Rule 7.1 ("[A]ll oppositions thereto shall be supported by a memorandum of law, setting forth the points and authorities relied upon . . . in opposition to the motion . . . . Willful failure to comply with this rule may be deemed sufficient cause for the . . . granting of a motion by default."). In any case, the Court finds this claim to be without merit for the reasons set forth below.

The Eighth Amendment prohibits cruel and unusual punishment by those "entrusted with the criminal-law function of government." *Whitley v. Albers*, 475 U.S. 312, 318-19 (1986). However, this prohibition applies only to individuals who have been *convicted* of crimes, which is not the case here. *Id.* ("The Cruel and Unusual Punishments Clause 'was designed to protect those convicted of crimes,' and consequently the Clause applies 'only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.'") (quoting *Ingraham v. Wright*, 430 U.S. 651, 664, 671 n.40 (1977)); *Deshaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 199 n.6 (1989) ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law.") (quoting *Ingraham*, 430 U.S. at 671-672, n. 40); *Katzman v. Khan*, 67 F. Sup. 2d 103, 111 (E.D.N.Y. 1999) ("The Eighth Amendment . . . applies only after conviction.") (citing *Whitley*, 475 U.S. at 318-19). Therefore, summary judgment is granted as to plaintiffs' Eighth Amendment claims.

### 6. Equal Protection

The Court finds that plaintiffs have failed to establish their claim that defendants violated the Equal Protection Clause of the Fourteenth Amendment. The Equal Protection Clause provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Constit. amend. XIV, § 1. To prevail on a claim of racial discrimination under the Equal Protection Clause, a plaintiff must prove that a government actor intentionally discriminated against him on the basis of race. *Brown v. City of Oneota*, 221 F.3d 329, 337 (2d Cir. 1999) (citing *Hayden v. County of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999)). Intentional discrimination may be shown by evidence of defendants' use of an express racial classification, defendants' intentional application of a facially neutral law in a discriminatory manner, or a facially neutral statute or policy that has an adverse effect and was motivated by discriminatory animus. *Brown*, 221 F.3d at 337 (citing *Adarand Contructors, Inc. v. Pena*, 515 U.S. 200, 213 (1995), *Yick Wo v. Hopkins*, 118 U.S. 356, 373-74 (1886), *Village of Arlington Heights v.*

*Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65 (1977), and *Johnson v. Wing*, 178 F.3d 611, 615 (2d Cir. 1999)). The substance of plaintiffs' Equal Protection claim is that plaintiffs were "arrested without probable cause because they are 'minority male teenagers.'" (Pls.' Br., at 13.) As explained *supra*, the Court finds that defendants had probable cause to arrest plaintiffs, and therefore, this assertion is without merit. Moreover, while plaintiffs assert that full discovery has not been completed with regard to these assertions, the existing record, which includes the deposition testimony of Glasgow, Sylla, Hussein, Officer Hachadoorian, and Sgt. White – all of which corroborate defendants' assertion that Hussein specifically identified plaintiffs as two of his attackers – provides no evidence to support plaintiffs' claims of racial discrimination. Therefore, plaintiffs' conclusory and speculative claims of intentional discrimination on the basis of race cannot withstand summary judgment, and defendants' motion as to these claims is granted.

### 7. *Monell* Liability

Plaintiffs also assert a § 1983 claim pursuant to *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978), against the City of New York. Under *Monell*, a municipal entity may be held liable under § 1983 where a plaintiff demonstrates that the constitutional violation complained of was caused by a municipal "policy or custom." *Monell*, 436 U.S. at 694-95; *Patterson v. County of Oneida*, 375 F.3d 206, 226 (2d Cir. 2004) (citing *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733-36 (1989), and *Monell*, 436 U.S. at 692-94). "The policy or custom need not be memorialized in a specific rule or regulation." *Kern v. City of Rochester*, 93 F.3d 38, 44 (2d Cir. 1996) (citing *Sorlucco v.*

*N.Y. City Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)). A policy, custom, or practice of the municipal entity may be inferred where "'the municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.'" *Patterson*, 375 F.3d at 226 (quoting *Kern*, 93 F.3d at 44). However, a municipal entity may only be held liable where the entity *itself* commits a wrong; "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691. Specifically, plaintiffs allege that the New York Police Department engages in the following unconstitutional practices: (1) disproportionately arresting minority males; (2) making baseless arrests in order to satisfy productivity goals, such as arrest quotas; (3) failing to train officers regarding unreliable witness identification and cross-racial identification. (Pls.' Br., at 15.) However, as the Court finds that no constitutional violation was committed against plaintiffs, *see supra*, no *Monell* claim can lie against the City of New York pursuant to § 1983. *See, e.g., Vippolis v. Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) ("A plaintiff who seeks to hold a municipality liable in damages under section 1983 must prove that the municipality was, in the language of the statute, the 'person who . . . subjected, or cause[d] [him] to be subjected,' to the deprivation of his constitutional rights.") (citing 42 U.S.C. § 1983). Therefore, the Court grants defendants' motion for summary judgment as to plaintiffs' *Monell* claims.[13]

---

[13] Likewise, with regard to the individual defendants, to the extent that they are being sued in their official capacities, the claims against them are duplicative of the *Monell* claim against the City of New York. *Tsotesi v. Bd. of Educ.*, 258 F. Supp. 2d 336, 338 n.10 (S.D.N.Y. 2003) (citing

IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is GRANTED, in its entirety. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 17, 2007
Central Islip, New York

\* \* \*

The attorney for plaintiffs is Rose M. Weber, Esq., Law Offices of Jon L. Norinsberg, 225 Broadway, Suite 1608, New York, New York 10007. The attorney for defendants is Michael A. Cardozo, Corporation Counsel of the City of New York, by David M. Hazan, Esq., New York City Law Department, 100 Church Street, New York, New York 10006.

---

*Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)); *see also Monell*, 436 U.S. at 691 (holding that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent"). Therefore, the *Monell* claims against Officer Hachadoorian and Sgt White in their official capacities are dismissed.